**Henrietta Davidson HOLT et al., Plaintiffs,**

**v.**

**William S. RICHARDSON, Lieutenant Governor of Hawaii, Defendant,**

**John J. Hulten et al., Members of the Legislature of the State of Hawaii, and John A. Burns, Governor of Hawaii, Intervenors-Plaintiffs,**

**Nelson K. Doi et al., Members of the Senate, Second Legislature, State of Hawaii, Intervenors-Defendants,**

**Edward F. Cravalho et al., Members of the House of Representatives, Second Legislature, State of Hawaii, Intervenors-Defendants.**

**Civ. No. 2308.**

United States District Court D. Hawaii.

Feb. 17, 1965.

5. August 9, 1962.

6. Hughes v. WMCA, Inc., 85 S.Ct. 713.

Charles M. Tonaki, Barry J. Rubin, Masaji Marumoto, Honolulu, Hawaii, for plaintiff.

Heen, Kai and Dodge, Robert G. Dodge, Honolulu, Hawaii, for defendant.

Bert T. Kobayashi, Atty. Gen. of Hawaii, Bertram T. Kanbara, Nobuki Kamida, Deputy Attys. Gen., Honolulu, Hawaii, for intervenors-plaintiffs.

Robertson, Castle & Anthony, Frank D. Padgett, James T. Funaki, Honolulu, Hawaii, for certain intervenors-defendants.

Before JERTBERG, Circuit Judge and BEEKS and PENCE, District Judges.

On August 13, 1964, the plaintiffs, citizens and residents of the State of Hawaii and qualified voters in their respective senatorial and representative districts, on their own behalf and as a class action on behalf of all other citizens, residents and voters in the State of Hawaii similarly situated, filed this complaint against William S. Richardson, Lieutenant Governor of Hawaii (he being responsible for the supervision of elections), seeking to enjoin Richardson from performing any duties relating to the nomination and election of candidates for State legislative offices unless the State legislature enacted a valid reapportionment plan for use in the 1964 elections, praying that this court should in any event make certain that the 1966 election would be conducted under an apportionment plan that would meet the requirements of the Fourteenth Amendment to the Constitution of the United States.

Plaintiffs alleged that the Constitution of the State of Hawaii apportioned the senate on the basis of geography and not population, and the house of representatives on the basis of registered voters and not population, and thus the State's scheme of apportionment was unconstitutional under the Fourteenth Amendment, in the light of Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and its companion cases of the same date: Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595; Lucas v. Forty-Fourth General Assembly of State of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632; Davis v. Mann, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609; WMCA v. Lomenzo, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 and Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620.

The Governor of the State, as well as all state legislators, both senators and representatives, filed their appearance as either intervening plaintiffs or defendants. (After the 1964 elections, all but one of the newly elected legislators likewise filed their appearance.)

A three-judge district court thereafter convened, found that it had jurisdiction under 28 U.S.C. §§ 2201 and 2281 et seq., as well as under the Civil Rights Act, 42 U.S.C. §§ 1983, 1988, and the court, after full hearing, on August 26, 1964, because of the imminence of the 1964 elections and the disruptive effects which an injunction would have had thereon, and because the State legislature at that date was convened in special session for the specific purpose of considering the problems of reapportionment, denied the motion for a preliminary injunction and set a hearing on the merits for January 11, 1965. (Cf. Roman v. Sincock, supra.) The legislature failed to agree on any reapportionment plan, and this decision follows the January hearing.

The Constitution of the State of Hawaii, after being hammered out at a Constitutional Convention composed of non-partisan delegates elected from all parts of the Territory, was adopted July 22, 1950, to become effective immediately upon the admission of Hawaii into the Union as a state. Hawaii was so admitted on August 21, 1959. The Constitution prescribes a senate of 25 members, obviously and admittedly apportioned basically upon the geographical and political divisions of the State, and 51 representatives apportioned as hereinafter described.

Hawaii is unique in many respects. It is the only state that has been successively an absolute monarchy, a constitutional monarchy, a republic, and then a territory of the United States before its admission as a state. Because each was insulated from the other by wide channels and high seas (C. A. B. v. Island Airlines, D.C., 235 F.Supp. 990 (October 8, 1964)) and historically ruled first by chiefs and then royal governors, after annexation the seven major, inhabited islands of the State were divided up into the four counties of Kauai, Maui, Hawaii

and the City and County of Honolulu.[1] All this resulted in a strongly centralized form of government.

By 1950 Honolulu, the State capital, had by far the largest population of any county, an essentially urban population, and had become an industrial, manufacturing, military and tourist center. The other three counties remained essentially rural and primarily concerned with agriculture and ranching. With the State having complete control over the judiciary, taxation, education, public health and welfare, etc., it was normal therefore that the three more rural counties of Kauai, Maui and Hawaii would not wish to leave such centralized power, particularly control over the State's purse strings, with urban Honolulu.

Patterning itself after the makeup of the United States Congress, Article III, Section 2 of the State Constitution apportioned the 25-member senate on a basis which enabled the senators of the three counties outside of Honolulu to have numerical control over that body. This was deliberately done in order to preserve the then nationally approved concept of checks and balances between rural and urban populations.

By Article III, Section 4, the house of representatives was apportioned under "the method of equal proportions," i. e., the same method as used in apportioning the members of the House of Representatives of the United States Congress,[2] giving the representatives from the County of Honolulu, with its larger population, potential control of the house. Both single and multi-member representative districts were set up throughout the State.

Under this same Section 4, using the method of equal proportions, the State legislators were apportioned among the four "basic areas", viz., the four counties, on the basis of the number of voters registered at the last preceding general election, and within the counties each representative district had its representation determined by the same method.

Under this same Section 4, the governor was mandated to reapportion the members of the house of representatives on or before June 1 of the year 1959, and at successive 10-year intervals thereafter. On May 1, 1959 (pursuant to Public Law 895, 84th Congress, 2nd Session, 70 Stat. 903), the Governor of Hawaii did reapportion the State in the above manner, and such reapportionment transferred increasing control to Honolulu.[3]

All parties before this court conceded (as was also determined by the Supreme Court of Hawaii in Guntert v. Richardson, 47 Hawaii ——, 394 P.2d 444 (July 27, 1964)) that Article III, Section 2, relating to the composition and apportionment of the State senate is indisputably invalid under Reynolds v. Sims, supra.

From the inception therefore, it was obvious that Hawaii's Constitution must be amended, at least to provide for a valid apportionment of its senate. In connection with any constitutional reapportionment of the senate, it must be noted that Article XV (Revision and Amendment), Section 2, para. 6, contains the following proviso:

> "* * * provided, that no constitutional amendment altering this proviso or the representation from any senatorial district in the senate shall become effective unless it shall also be approved by a majority of the votes tallied upon the question in each of a majority of the counties."

1. The artificial and isolated County of Kalawao has always been strictly a Hansen's disease treatment area, operated and controlled by the Board of Health of the Territory and State. It votes with Maui County for State Legislators.

2. Proceedings of the Constitutional Convention of Hawaii, Volume II, (Proceedings), pp. 112–123. See also, Reynolds v. Sims, supra, note 10.

3. After the Constitutional Convention, Congress put into permanent effect the reapportionment provisions of the proposed State Constitution. (Davis v. Quinn, 43 Hawaii 261, 269.)

As appears in the Proceedings, pp. 761–64, this proviso was specifically inserted in order to freeze representation in the senate, and it gave to the rural counties what amounted to the right of veto over any attempt to change the representative makeup of the senate. This proviso is so closely tied in with the admittedly invalid scheme of senatorial apportionment that it, too, is likewise constitutionally invalid and falls along with Article III, Section 2.

Plaintiffs urge that Article III, Sections 3 and 4, relating to apportionment of the house, are likewise invalid because they are a part of the total scheme of legislative apportionment, inferring that the house would not have been apportioned as it was but for the senate being apportioned as a built-in check in setting up the "checks and balance" scheme of the United States Congress.

This Court finds that this is not necessarily true. Apart from one problem discussed immediately below, nothing has been called to our attention and we find no evidence—not even in the Proceedings—that the Constitutional Convention would have apportioned the house in any other way than it did.[4]

Plaintiffs urge that in any event, the house of representatives is unconstitutionally apportioned because apportionment thereof is based upon the number of voters registered at the last preceding general election (Art. III, Sec. 4), and not upon a gross, i. e., total population basis.

Article II, Sections 1 and 2, covering suffrage and elections, provides, in substance, that every literate United States Citizen who is compos mentis and not an unpardoned felon, 20 years old or more, residing in the State not less than one year next preceding the election, and a registered voter, shall be qualified to vote. This court finds nothing in Article II which is constitutionally invidious as discriminating against any one on the basis of race, color, creed, employment or geographical location, and as indicated in Article III, Sections 2 and 3, defining who may elect senators and representatives, it appears that the term "qualified voters" is used practically synonymously with registered voters under Article III, Section 4.

This court is not prepared at this time to accept plaintiff's premise that total population is the *only* basis upon which apportionment of state legislatures can constitutionally be based. The Court in WMCA v. Lomenzo, supra, notes that "New York uses citizen population instead of total population, excluding aliens * * *, for purposes of legislative apportionment" and apparently found nothing invidious in that fact. In Maryland Committee v. Tawes, supra, The Court said:

> "Rather, the proper, and indeed indispensable, subject for judicial focus in a legislative apportionment controversy is the overall representation accorded to the *State's voters*, in both houses of a bicameral state legislature." (Emphasis added.)

The Court thus re-expressed what it said in Gray v. Sanders, 372 U.S. 368, 379, 83 S.Ct. 801, 808, 9 L.Ed.2d 821:

> "Once the geographical unit for which a representative is to be chosen is designated, *all who participate in the election* are to have an equal vote—whatever their race, * * * their income, and wherever their home may be in the geographical unit." (Emphasis added.)

The Court has said time after time throughout Reynolds v. Sims, supra, and

4. In connection with both the senate and the house of representatives, plaintiffs have claimed that the *number* of legislators in each house, viz., 25 and 51, are part of some invidious scheme. Exhibit 14, Table 14 clearly illustrates that there is no built-in magic or invidiousness in the use of such numbers. The matter of the size of each legislative body and the adoption of a 15-member senate and 31-member house, or a 21-member senate and 41-member house, as well as the ultimately approved 25-member senate and 51-member house were thoroughly explored by the Convention. (Proceedings, pp. 89–101, 112–132)

the companion cases only that "both houses must be apportioned substantially on a population basis." (Emphasis added.)

Plaintiffs urge and have presented figures showing that on the basis of the 1960, 1962 and 1964 population, the house of representatives is malapportioned. To begin with, paraphrasing Guntert v. Richardson, supra, 1950 and 1958 registered voters, and 1960, 1962 and 1964 population, are not comparable figures. The Court does not demand that legislatures be reapportioned annually. Reynolds v. Sims, supra, Subject VIII. This court, at this time, can only determine if the basis of apportionment, when adopted in 1950 and when used for reapportionment in 1959, did in fact at those times result in apportionment "substantially on a population basis."

The Convention tried "to write into this Constitution a proposal that would not deny a single individual in this territory the right to suffrage." (Proceedings, p. 49) The basis of apportionment by population vs. registered voters was thoroughly discussed.

> "The idea among other things was to make the districts as nearly equal population-wise as possible * * " (Proceedings, p. 107)
>
> * * * * *
>
> "One of the reasons why the reapportionment directed by the Organic Act [5] was not carried out was because that act required reapportionment on the basis of citizen population. A breakdown of the population according to this standard has not been locally available. Total population figures for the territory are shown by census tracts which do not necessarily coincide with locally defined areas. As a practical matter, the number of registered voters was found to bear a reliable and fairly uniform relationship to total population, although it favors slightly the neighbor islands where the percentage of persons who have registered to vote is from one to two per cent higher than for Oahu. It was in recognition of the potential difficulty in obtaining figures which would show citizen population, or figures which would show total population by desirable districts, that the basis for reapportionment of the members of the House was chosen as the number of registered voters." (Proceedings, p. 107)
>
> "The problem as stated in the report and as stated by the committee chairman this morning of using population in these districts is that it is next to impossible to obtain accurate population figures for the districts that we want to use or even for the old precincts or for any districts, unless you should take your representative districts to be the same districts that are used by the Census Bureau. Now it is quite possible that by the next census we could convince the Census Bureau that they should break their areas up into the areas that we may decide upon for representatives.
>
> "* * *. [I]n checking this over in the committee we found that there was actually percentage wise or using the method of equal proportions or anything else, very little difference whether we used registered voters, votes cast or population." (Proceedings, p. 124)

The testimony of Robert Schmitt [6] (see Transcript of Proceedings of Au-

5. Organic Act, Secs. 60, 62.

6. Robert Schmitt: employed by the Department of Planning and Economic Development of the State of Hawaii; a member of the American Statistical Association; member of the Population Association of America and author of some 60 articles in professional journals; Research Development Analyst in charge of the Research Division of the Honolulu Redevelopment Agency for four years; in charge of research for the Seattle City Planning Commission; author and editor of the Statistical Abstracts of Hawaii; census tract key person for Honolulu of the U. S. Bureau of Census for many years; holds a Master's Degree from

gust 1964 hearings (TR) beginning p. 80) illustrated with certainty that the term "population" as determined by the Census Bureau was far from an accurate or reliable method of determining the true number of *residents* of a given area —at least in Hawaii.

"The 1960 Census definition of population used in its compilation, * * included all armed forces stationed ashore in Hawaii, regardless of their legal or voting residence. It included all men aboard ships in Hawaii ports on the census date * * * April 1st, 1960; that is [if] a ship tied up in Kapalama Basin or in Pearl Harbor, Ford Island, the entire crew of that ship was assigned to that geographic area.

"This was also true in the case of civilian ships. For example, the Ala Wai Yacht Harbor included a number of house boats and yachts which were enumerated in Hawaii." (TR 80)

"* * * If the person on the night preceding the census had been there * * * each hotel or transient accommodation was enumerated * *.

"[T]hey enumerated every person in Hawaii at that time, but they then reallocated them to their home states * * *." (TR 81)

"* * * We don't know how many were here at that time. *But we made an estimate* * * *. The Census Bureau did *not* report how many such persons were reallocated." (Emphasis added.) (TR 82)

"* * * There is no certainty how many were reallocated. We assume that all of them were." (TR 83)

"There were two ships [picked up in the 1960 census], one the Kiwishiwi * * * and the other the Black Hawk * * *. [T]he total personnel of perhaps four hundred * * * were assigned to [an area of Waikiki along the Ala Wai Canal] * * *. [H]ere we had approximately four hundred of the ship's crews * * * classified as military * * * who were assigned to this [Waikiki] enumeration district. * * *

"[I]n 1920 * * * they inadvertently threw 3,000 Pearl Harbor people into the * * * Honolulu judicial district." (TR 106–07)

"In 1960, the number of members of the Armed Forces * * * was either 54,000 or 47,000 * * * [or 42,122 if we subtract the 1960 civilian population of 590,650 from 632,772—See Ex. 14, p. 12], the census count was 47,000, and the Department of Defense counted 54,000." (TR 116)

Since the total civilian population of Hawaii (excluding the military) in 1960 was but 585,505 (Ex. 14, Table 12), it is seen that the military did account for about 10% of the total population. (1960 Census estimate, Ex. 15, Table 9.) Hawaii has become the United States' military bastion for the entire Pacific and the military population in the State fluctuates violently as the Asiatic spots of trouble arise and disappear. If total population were to be the only acceptable criteria upon which legislative representation could be based, in Hawaii, grossly absurd and disastrous results would flow from a blind adherence to "the elusive 'one-person-one-vote' aphorism." (Mr. Justice Harlan in Fortson v. Toombs, 85 S.Ct. 598 (January 18, 1965.)

For example, if Hawaii's reapportionment year had been 1944, when the civilian population was 464,250 and the military population was 407,000, then areas which normally might have a total population entitling them to but a small percentage of the total number of legislators would suddenly find themselves

the University of Cincinnati, with additional graduate work from the University of Hawaii, University of Michigan and the University of Washington. (TR 69–70)

controlling over 90% of the legislature—for the following ten years!

In contrast to the above, in 1950, with a civilian population of 472,780, there were but 21,000 military in Hawaii—less than 5%. In two years, this had jumped to 55,000. In 1958 there were 55,000 military, with a civilian population of 555,222. Two years later, there were 79,000 military in Hawaii. (Ex. 15, Table 11) As the plaintiffs have admitted, if the State were reapportioned at the present time on a straight total population basis, the *Fifth* senatorial district, containing within its bounds most of the military and naval installations of the State, would be entitled to 13 senators—a majority of the Senate!

A theoretical proposed redistricting of the City and County of Honolulu (Ex. 8) based on total population under the *1960* census, with the primary consideration being substantial equality of *total population,* gave Oahu 20 senators out of 25, and 41 representatives out of 51. (TR 189—Schmitt) A result of such proposed redistricting was that the largest representative district in point of population would be the one that included Schofield Barracks "in fact, it is completely Schofield Barracks," (TR 190) i. e., military population. Although it would thus become the largest representative district in the State, "in point of registered voters [it would be] the smallest district on the island." (TR 191) And Schmitt admitted, in testifying concerning Exhibit 17, that it was possible in a single representative district so reapportioned on a total population basis, for such a district to have almost no voters at all.

This court does not have before it the problem presented to the Supreme Court of Hawaii in In Re Robinson, Jr., No. 4465, Memorandum Opinion (October 30, 1964), rehearing granted January 18, 1965, viz., the question of whether a service man's residence on a Federal military reservation precludes him from establishing his residence in Hawaii. If he so desires to become a resident of Hawaii, this court can only state that there is nothing in the State Constitution or the Hawaii statutes which per se excludes members of the armed forces from establishing their residence in Hawaii and thereafter becoming eligible to vote. This court finds no scheme in Hawaii's Constitution or in the statutes implementing the exercise of franchise which is aimed at disenfranchising the military or any other group of citizens.

Not only does the fluctuating military population of the State make representation on the basis of total population politically suspect, but the large number of tourists [7] who continually flow in and out of the State and who, as above indicated, for census purposes are initially at least, counted as part of Hawaii's census population (10,000 estimated, 1960 census), would likewise result in gross inequity to citizens of the State eligible to vote, if total population were held to be the only constitutional basis for reapportionment in Hawaii.

The difficulties undoubtedly faced by the Constitutional Convention in determining the best method to set up a system giving equality of representation is further illustrated by references contained in Exhibit 14 on statistics based on the year 1960—not the year 1950 when the Constitution was adopted, or 1959 when the house of representatives was reapportioned. Exhibit 14, Table 1 shows that the total *civilian* population as of July 1st, 1960 was 590,650, with 202,059 registered voters or 34.2% registered. Table 3 shows the *total* population as 632,772, thus indicating but 31.9% of the population as having registered. Table 4, however, shows that out of the State population of 312,478 *United States citizens* (thus including the military) of voting age, the 202,059 registered voters accounts for 64.7% of all that class. Table 5 indicates that out of

7. The Hawaii Visitors Bureau statistics show that tourists in Hawaii, for overnight or longer, numbered—in 1950 46,593; in 1958, 171,588; in 1960, 296,517; in 1962, 362,145; in 1964, 510,000 (preliminary figure).

the *total* population age 20 or over (thus including non-citizens), of 360,193, 231,914 could qualify as being eligible to register. Thus even in 1960, the registered voters actually accounted for 87.1% of all of the possible *voting population* of the State of Hawaii.

That, in Hawaii, apportionment on a registered voter basis is not invidous per se, is further illustrated by Exhibit 14, Table 13, wherein it appears that 19 senators would be apportioned to Honolulu regardless of whether the basis was registered voters in the 1962 election or civilian population. Likewise, there is shown but a difference of two representatives (38–40) for Honolulu in such projected apportionment of the house, a difference which might result from the application of the method of equal proportions.

Hawaii's centralized education system has resulted in an unusually literate citizenry, and interest in politics and strong drives to bring out the vote have resulted in a vote of from 88 to 93.6% of all registered voters during the elections of 1958, 1959,[8] 1960 and 1962. (Ex. 14, p. 12)

Representation based upon those eligible to vote, rather than registered voters, might conceivably have been a better solution, but neither in 1950 nor in 1958, as Schmitt testified (TR 96–98), was there statistical data available from which the necessary figures could have been gleaned and applied to the representatives districts. As he also said, any attempt to determine the number of military personnel or their dependents who are eligible to vote in Hawaii by representative district "would strain the available statistical sources to the breaking point." (TR 98)

This Court does not hold that registered voters as a basis for representation is the perfect basis. Paraphrasing the words of The Court in Fortson v. Dorsey, 85 S.Ct. 498 this court finds the use of registered voters as a basis of apportionment did not, in Hawaii, in fact "designedly or otherwise * * * operate to minimize or cancel out the voting strength of [any] * * * elements of the voting population." (At p. 501) Nor did it in 1959 bring about that result.

As the records of the Constitutional Convention show (Proceedings 103–111), the districting, both for the senate and the house of representatives, followed along historical, political, geographic and physical lines. There was no gerrymandering in the invidious sense. As Dr. Schmitt testified (TR 96), the representative district lines sometimes cross statistical matters reported in the census, because the census divided up the State into census tracts. While for some of the cities of the State block statistics are available, nevertheless it is rather rare when the census tract coincides with the precinct in an election district. "There seems to have been an unfortunate disregard of precinct boundaries and representative district boundaries in laying out the census tracts and vice versa." (TR 96)

Plaintiffs have pointed to the result of the redistricting in Representative Districts Nos. 1 and 2—Puna and South Hilo on the Island of Hawaii—as proof positive that the districting brought about a result condemned in Reynolds v. Sims, supra, as unconstitutional, in that in 1959, given a man-average per representative of 3437 voters, Puna with a 1958 registered voter population of but 2209 was given one representative and South Hilo with a registered voter population of 13,836 was given but three (i. e., 4459 voters per representative)—ergo an arbitrary and invidious dilution of the votes of the South Hilo voters! While The Court did state:

> "[I]t is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or 10, while the votes of persons in another area would be counted only

8. First political implementation under Statehood.

at face value, could be constitutionally sustainable",

this broad conclusion, however, was modified a few lines thereafter by the following:

> "Weighting the votes of citizens differently, by any method or means, *merely* because of where they happen to reside, hardly seems justifiable." Reynolds v. Sims, supra. (Emphasis added.)

As was also stated by Mr. Justice Black in Colegrove v. Green, 328 U.S. 549, 569–571, 66 S.Ct. 1198, 1211, 90 L.Ed. 1432:

> "[T]he constitutionally guaranteed right to vote and the right to have one's vote counted clearly imply the policy that state election systems, no matter what their form, should be *designed* to give *approximately* equal weight to each vote cast. * * *" Reynolds v. Sims, supra, note 40. (Emphasis added.)

The record of the Proceedings (pp. 139, 141, 157) shows that in an endeavor to make all of the representative districts of the State large enough so that the figures would approach the 1950 common denominator of 2445, Puna (1st Representative District), when combined with Keaukaha (now in the 2nd Representative District) came to 2355. The delegates from South Hilo opposed this because geographically Keaukaha was separated from the nearest inhabited portion of Puna by a lava forest over six miles wide, traversed by but one road. It was an integral part of the City of Hilo, using that city's power, water, police, fire protection, schools and all public services. Its population was almost entirely of Hawaiian extraction; almost all of its inhabitants were employed only in Hilo; and basically, it had no community, ethnic or industrial bond or interest with Puna.

The voting population of Puna, on the other hand, was very predominantly of Japanese extraction, with no urbanization whatsoever, and with almost its entire population employed by one sugar plantation.

Keaukaha had 644 voters. It was recognized that the 1711 voters of Puna ethnically, industrially and socially were a cohesive unit, and such districting, as a matter of practical politics, would have left Keaukaha with *no* real representation.

> "[Keaukaha] was put in Puna in the first place * * * [in] * * * an effort to get a larger number of voters in the district that was going to elect one representative. It should be the natural thing to put it in South Hilo as [the delegates from Hawaii County] propose to do it now and it would not disturb the allocation of voters between Puna and South Hilo, and North Hilo and Hamakua." (Proceedings, p. 157)

As a matter of fact, also, neither in Puna nor in South Hilo did the resultant number of voters per representative, then or in 1959, violate the method of equal proportions. This court finds ample justification for and no invidious vote dilution in the above districting.

As indicated above, this court cannot say that Hawaii's method of districting was part of any invidious scheme to disenfranchise any person or group, or to dilute the vote of any person. In hindsight, this court could say, as did Dr. Schmitt, that for the purpose of determining eligibility to vote in any precinct or district, it would be far easier to secure some such information if the districting and precinct lines also coincide with the census county divisions and census tracts. (Tr 96)

There is nothing which appears in the Proceedings (pp. 173–74) to indicate that the ordering of reapportionment of the house in the year preceding that in which the census is normally taken was part of a scheme to dilute the vote of any person, rather, that year was used because the 5th Legislative Session after the Constitutional Convention would have terminated its work in May 1959. Since reapportionment was based upon regis-

tered voters, the census figures did not appear to the delegates to have any application.

Obviously, if the rights of the citizens of Hawaii are to be protected, the Constitution of the State of Hawaii must be amended—and amended before the 1966 general elections. The action of the legislature in failing to provide for reapportionment during its special session called for that purpose only last summer was disappointing to this court —and undoubtedly to the Supreme Court of Hawaii. See Guntert v. Richardson, supra.

As pointed out by the Supreme Court of Hawaii in Guntert, any change in the representation from any senatorial district must be by constitutional amendment. This court concurs!

Under Article XV, Section 3 of the Hawaii Constitution, while the legislature may propose amendments to the Constitution, such amendments can only be voted on at a general election. If the legislature at its special reapportionment session of 1964 had proposed any reapportionment amendment, it could have been voted on in the 1964 election, but that legislature did not so act. Having determined that the senate at least, must be reapportioned before the 1966 general election, this court, in the inception, is now compelled to attempt to achieve that result by following the constitutional method provided under Article XV, Section 2. In the event that the constitutional route fails or, if followed, produced an invalid scheme of apportionment, only then would this or any other court be justified in attempting to assume the Herculean task of devising and enforcing a temporary reapportionment system.

In the event that a Constitutional Convention is convened, then in view of the questions and problems which have been raised before this court in this case, as well as before the Supreme Court of Hawaii in Guntert v. Richardson, supra, the delegates, in addition to providing for reapportionment of the senate, may also wish to reconsider the question of:

1. Whether it will continue to use registered voters as the apportionment basis, or change it to State citizen population eligible to vote (i. e., voter population), or citizen population, or total population.

2. Whether it is better to have one or both houses of the legislature composed of single member representative districts, or to have and justify[9] one or both houses composed in whole or in part, of multi-member of floterial districts.

3. Whether decennial reapportionment of either or both houses should be made on or before June 1st of the year preceding the Federal census—as is now the case—or on a date soon after the taking of such census.

4. Whether the representative district lines should remain substantially as they now are or whether ultimately (i. e., after 1970) there should be redistricting in such a manner that the census tracts and representative districts can be coordinated for the statistical purposes necessary to implement the changes (if any) made in the basis of reapportionment.

It is therefore ordered, adjudged and decreed:

1. Those provisions of Article III, Section 2 of the Constitution of the State of Hawaii fixing the number of senators per senatorial district are hereby declared unconstitutional and invalid. The remainder of Article III of said constitution is declared constitutional and valid.

2. The proviso at the end of the sixth paragraph in Section 2 of Article XV pertaining to amendments affecting representation in the Senate is hereby declared unconstitutional and invalid. The remainder of Article XV is declared constitutional and valid.

3. The plaintiffs and intervening plaintiffs have failed to prove that the

9. Butcher v. Bloom, 415 Pa. 438, 203 A.2d 556, 572–573.

apportionment of the House of Representatives of the Legislature of the State of Hawaii causes any invidious discrimination in the weight of their vote or that such apportionment is the result of arbitrary or capricious action. Their prayers for relief in this respect are therefore denied.

4. This court will not interfere with the convening or conducting of the business of the Third State Legislature in regular session in 1965, save and except that the parties herein are hereby enjoined from taking final action upon any legislation, except such actions as are necessary to organize the respective houses at such session and appropriate funds for the session, until legislation, pursuant to the provision of Article XV of said Constitution providing for the submission to the people of Hawaii, by special election to be held not later than August 1, 1965, the question: "Shall there be a convention to propose a revision of or amendments to the Constitution?", and for any and all acts required by law to implement such legislation, has been enacted into law. Such legislation shall also provide that if the vote be in the constitutional affirmative, then a special election shall be held not later than September 15, 1965 to elect delegates to the convention in the manner provided in the Constitution. Such legislation may include legislative action under Article XV, Section 2, 4th paragraph, of the Constitution. Such legislation shall further provide that the convention convene not later than October 15, 1965 and that it conclude its deliberation in time to submit its proposed constitutional amendments to the electorate of Hawaii at a special election to be held not later than January 30, 1966, including (but not limiting the convention thereto) provisions therein for reapportioning the Senate of Hawaii on a constitutionally valid basis. Such legislation shall also appropriate and make available funds for the expenses of such elections and convention.

5. The offices of all senators of the Hawaii State Senate are hereby declared vacant as of the day of the general election of 1966. Until such date, the existing offices of all senators elected under Article III, Section 2 of the Constitution, shall be valid.

6. This court retains jurisdiction of this action for all purposes, including but not limited to (a) considering such sanctions as may be appropriate if the orders of this court are not carried out; (b) judicially reapportioning the Senate in the event that the electors of Hawaii reject a constitutional convention, or the convention fails to propose an amendment reapportioning the Senate, or the electors reject such an amendment, or if any amendment of the convention does not insure the apportionment of the Hawaii State Legislature in accordance with the requirements of the Equal Protection Clause of the 14th Amendment to the Constitution of the United States.

7. All other relief prayed for in the Complaint, Complaint in Intervention, and Cross Complaint is hereby denied.