Henrietta Davidson **HOLT** et al.,
Plaintiffs,

**v.**

William S. **RICHARDSON**, Lieutenant
Governor of Hawaii, Defendant,

John J. Hulten et al., and John A. Burns,
Governor of Hawaii, Intervenors-
Plaintiffs,

Nelson K. Doi et al., and Elmer F. Craval-
ho et al., Intervenors-Defendants.

Civ. No. 2308.

United States District Court
D. Hawaii.

April 23, 1965.

———◆———

Charles M. Tonaki, Barry J. Rubin, Honolulu, Hawaii, Masaji Marumoto, Assoc. Counsel, Honolulu, Hawaii, for plaintiffs.

Heen, Kai & Dodge, Robert G. Dodge, Honolulu, Hawaii, for defendant.

Bert T. Kobayashi, Atty. Gen., State of Hawaii, Bertram T. Kanbara, Nobuki Kamida, Deputy Attys. Gen., Honolulu, Hawaii, for intervenors-plaintiffs.

James T. Funaki, Honolulu, Hawaii, Robert Kimura, Honolulu, Hawaii, for intervenors-defendants.

Before JERTBERG, Circuit Judge, and BEEKS and PENCE, District Judges.

PER CURIAM.

This court has now before it the Hawaii State Legislature's H.B.No.987, S.D. 1, C.D. 1; H.B.No.773, S.D. 1, C.D. 1; and H.B.No.986, setting forth that body's response to this court's order of March 9, 1965, viz., presenting (a) a plan for the provisional reapportionment of the Senate on the basis of the voters registered for the 1964 general election; (b) a proposed constitutional amendment encompassing the same plan; and (c) a submission to the electorate in 1966 of the question of calling a constitutional convention.

The road by which the above bills reached this court is tortuous. In August of 1964, when this court first heard this case, the Legislature of Hawaii was then sitting in special session called by the Governor of Hawaii for the specific purpose of attempting to devise a scheme of legislative reapportionment which would be constitutionally valid. The legislature at that session failed to agree on any reapportionment plan. After a hearing in January 1965, this court, on February 17, 1965, 238 F.Supp. 468, found that Article III, Section 2, of the Hawaii State Constitution fixing the number of senators per senatorial district, as well as the proviso at the end of the sixth paragraph in Section 2 of Article XV of the constitution, were invalid, "determined that the Senate *at least* must be reapportioned before the 1966 general election," and enjoined the Third State Legislature in its regular 1965 session from passing any but preliminary "housekeeping" acts until it had set up the machinery for the convening of a constitutional convention to amend the State's legislative scheme of apportionment before the 1966 election. (Emphasis added.)

On March 1st, 1965, the legislature, then convened in regular session, requested this court to alter its order of February 17th so as to permit the legislature itself during that session to pass legislation:

(a) enacting a provisional plan for reapportioning the senate on the basis of the 1964 registered voters, to be effective for the 1966 election and until a constitutional amendment on reapportionment had been adopted by the people of Hawaii as provided in the constitution;

(b) adopting a proposed constitutional amendment embodying pertinent provisions of the foregoing reapportionment plan to be presented to the electorate for ratification at the 1966 general election; and

(c) submitting to the electorate at that 1966 election the question, under

Article XV of the State constitution: Shall there be a convention to propose a revision of or amendments to the constitution?

Counsel for all parties to the suit were in accord with the objectives outlined in the motion, and this court was satisfied from the representations made that the constitutional convention route prescribed by its February 17th order would be very expensive and perforce would demand the devotion of great time and effort from the people of Hawaii. The court, then, also believed that the legislators, each and all, would recognize their obligations to the entire electorate of Hawaii, would rise above any possible self-interest, would heed the admonitions of the Attorney General, and would certainly note the flashing red lights of the caveats set out in this court's order of February 17th, viz., that a constitutional convention *in addition* to providing for reapportionment of the senate might also consider (1) whether the registered voter population should continue to be used as the basis for apportionment, or some other type of population basis should be adopted; (2) "whether it is better to have one or both houses of the legislature composed of single member representative districts, or to have and *justify* [9] one or both houses composed in whole or in part, of multi-member or floterial districts. (Note) [9] Butcher v. Bloom, 415 Pa. 438, 203 A.2d 556, 572–573" (emphasis added); (3) whether there should be a change in the date of decennial reapportionment; and (4) whether there should be redistricting of the representative districts.

This court therefore, by order of March 9, 1965, altered its February 17th order to permit the legislature (a) to enact a provisional reapportionment and redistricting plan for the senate; (b) to adopt "a proposed constitutional amendment embodying *pertinent* provisions of the foregoing reapportionment and redistricting plan" for submission to the electorate at the 1966 general election (emphasis added); (c) to enact legislation to submit to the electorate the question: Shall there be a convention to propose a revision of or amendments to the constitution? This order, like the one of February 17th, demanded that the plan be approved by this court; failing approval, the order of February 17th demanding legislation for implementing a constitutional convention would again become effective.

On March 18th this court was advised that a provisional plan, in substance approved by both houses, was then in conference committee and about ready to be presented to this court, whereby the senate was reapportioned by dividing the State into the same original six senatorial districts, changing only the number of senators allocated to each district, based upon the use of the method of equal proportion. By that March 18th plan, two senators were apportioned to the first senatorial district—East Hawaii; one to the second—West Hawaii; two to the third—Maui; nine to the fourth—Southern Oahu; ten to the fifth—the remainder of Oahu; and one to the sixth—Kauai.

The legislature quickly thereafter was informally made to understand that such a grossly lumpy apportionment of senators, whereby forty per cent of the entire senate would come from one senatorial district and thirty-six per cent from another alongside, could never be approved, and the plan was forthwith withdrawn from conference committee for reconsideration by the house of representatives. Shortly thereafter, this court flashed an even brighter red light on its caveat number (2) above by informally indicating that because Hawaii had a multi-member district house, any other than single member senatorial districting would have to be justified to this court.

On April 14th, 1965, the legislature passed and sent to this court the numbered bills identified supra:

*A.* H.B. 987, its proposed provisional senatorial reapportionment plan; H.B. 773, its proposed constitutional amendment embodying that same plan; and H. B. 986, submitting to the electorate in

the 1966 general election the question of the calling of a constitutional convention. By H.B. 987, the State was divided into eight senatorial districts, viz.:

| County | Senatorial District | No. of Senators | 1964 Registered Voters per District |
|---|---|---|---|
| Hawaii | First | 3 | 28,130 |
| Maui | Second | 2 | 18,786 |
| Honolulu | Third | 3 | 27,073 |
| " | Fourth | 4 | 35,780 |
| " | Fifth | 4 | 39,361 |
| " | Sixth | 4 | 40,629 |
| " | Seventh | 4 | 37,336 |
| Kauai | Eighth | 1 | 12,266 |

*B.* Exhibits A and B, attached to the plan, the same being the reports of the conference committee on the proposed provisional plan (H.B. 987), as well as the proposed plan for the constitutional amendment (H.B. 773) embodying the same, setting forth the conference committee's "justification" for wholly abandoning any attempt to redistrict the senate on a single member district basis.

Senate exhibits Nos. 5 and 6 (maps also filed), outlined the geographical boundaries of the respective senatorial districts of Honolulu.

The court would agree that the number of registered voters per senatorial district and apportioned to the four basic areas, viz., three to the County of Hawaii, two to the County of Maui, nineteen to the City and County of Honolulu, and one to the County of Kauai, conforms to the standards required under the method of equal proportions prescribed by the Constitution of the State of Hawaii and thus meets that one test of constitutionality. Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

In the attached committee reports, the reasons given, i. e., "justification", for choosing multi-member districts of three and four senators per district were substantially: (1) single-member districts would tend to cause the senators therefrom to be concerned with localized issues and ignore the broader issues facing the State, and therefore it might fragment the approach to state-wide problems and programs to the detriment of the State; (2) historically the members of the house had represented smaller constituencies than members of the senate, and tradition and experience had proved that balance desirable; (3) multi-member districts would increase the significance of an individual's vote by focusing his attention on the broad spectrum of major community problems as opposed to those of more limited and local concern; (4) to set up single-member districts would compound the more technical and more intricate problem of drawing the boundaries; (5) population shifts would more drastically affect the boundaries of many smaller single-member districts— to a greater degree than would be found in larger multi-member districts, citing Oahu's population boom and subdivision development.

In drawing the district lines the legislature reported that it "relied very heavily" on the standards of compactness and contiguity—"geographical separation and long-established representative precinct lines."

Except for the slightly misleading conclusion that the third senatorial district was *primarily* a suburban area, and that the fourth senatorial district was com-

posed of substantially plantation and suburban communities, from the report it appears that no other criteria, save number of registered voters, geographical boundaries and historical representative district lines were considered or used in forming the plan. Apparently, ethnic, political, industrial, economic, social, occupational factors, and community of interests and problems were given little if any consideration by the legislature.

The testimony of Senator Sakai Takahashi, chairman of the conference committee, at the April 15, 1965 hearing on the plan, summed up the legislature's underlying raison d'etre with his statement: "We thought it fair."

Mr. Robert Schmitt, statistician, who had testified at length in the hearing of August 1964, again a witness, testified in favor of applying the law of large numbers, viz., that smaller areas with small numbers fluctuate in much greater proportion than do larger areas with larger numbers, to senatorial districts. He, however, had *not been consulted* on the problem of the multi-member districts vs. single-member, or the problem of district lines.[1]

In analyzing the plan, all Mr. Schmitt could say for the third senatorial district was that it had excellent statistical boundaries.[2] It was logical to deduce from his testimony that the boundary between the fourth and fifth senatorial districts had accidentally resulted in an excellent *line of division,* in that it separated the military area, i. e., military housing, etc., from the city proper. The best that he could say, however, for the

line between the fifth and sixth senatorial districts was that it neatly separated the central business district from residential areas alongside. The line between the sixth and seventh senatorial districts was historical.

Mr. Schmitt, in contradistinction to the conference committee, found it necessary to analyze the representative districts and criticized many of them as being far too small, e. g., the first—on Hawaii, the thirteenth—Kalihi, on Oahu; or much too large, e. g., the fifteenth— with its six representatives. Schmitt pointed out that within the fifteenth district, in the Moiliili area, there was a higher proportion of persons of Japanese ancestry than in any census tract of the island, yet Waikiki, primarily concerned with tourist service, was the second highest among census tracts in percentage of Caucasian residents. Also, high-level professional, technical and managerial people tended to live in Waikiki or upper Manoa,[3] whereas operatives, laborers, clerical workers, middle and lower-middle income people lived in the central (Moiliili, etc.) area.

Mr. Schmitt stated that the fifth senatorial district likewise encompassed a highly heterogeneous area containing a multitude of Caucasian widows in the uplands area, and an overabundance of Filipino males in the seaward portion of the district. The twelfth representative district, therein, had a very high proportion of persons of foreign birth or Asiatic ancestry, of the lower-middle socio-economic group.[4] Schmitt's only other

---

1. In its (unsubmitted) plan of March 18th, supra p. 726 two senators were to be elected from East Hawaii, and one senator from West Hawaii. The total registered voters in 1964 in East Hawaii was 20,770, and in West Hawaii was 7,-360. In the present provisional plan, this division of the Island of Hawaii was dropped and three senators were to be elected from the first senatorial district, which would now include the entire island. Of the seven senators presently elected from districts one and two, five live within a short distance of each other in Hilo, in East Hawaii.

2. The location of the residences of two of Honolulu's present total of ten senators is in this district.

3. The residences of the three senators from the present fourth senatorial district showed that all lived only a very short distance apart in the upper Manoa area of the fifteenth representative district.

4. Similarly, three senators from the fifth district likewise lived a short distance from each other in the twelfth representative district.

comment regarding the fifth senatorial district was that the boundary between the twelfth and thirteenth representative districts, i. e., within the proposed fifth senatorial district, had a very unfortunate location.

Schmitt also pointed out that within the seventh senatorial district were two clearly defined and geographically, economically and socially divided groups. In Palolo in the sixteenth representative district area were found the lower socio-economic laborers, operatives, and clerical workers, and in the Waialae-Kahala and Aina Haina areas were the highly professional and managerial class. In the latter area the median annual family income in 1959 was almost $16,000, whereas in Palolo it was $3,000.

From the committee reports and the testimony of Senator Takahashi, it is obvious that the legislature gave sparse, if any, consideration of any of the facts or factors pointed out by Mr. Schmitt, in devising its scheme of multi-member senatorial districts for Oahu.

Although we initially determined that the house of representatives was not unconstitutionally apportioned, by that decision we did not say that those representative districts had been perfectly laid out. We agree with Mr. Schmitt that, compared to the makeup of all other representative districts in the State, the fifteenth is too large.

There can be no truly representative government without a system of apportionment which provides potentially equal representation to the divergent factors incorporated within · the body politic. Our own representative form of government demands checks and balances, devices and procedures to channel the many and diverse interests of the people into the making of a stream of legislation that produces for each person in that state the maximum beneficence possible. Methods of securing this desired objective were pointed out in Reynolds v. Sims, supra, 377 U.S. at 576–577, 84 S.Ct. at 1389:

"Different constituencies can be represented in the two houses. One body could be composed of single-member districts while the other could have at least some multimember districts. The length of terms of the legislators in the separate bodies could differ. The numerical size of the two bodies could be made to differ, even significantly, and the geographical size of districts from which legislators are elected could also be made to differ. And apportionment in one house could be arranged so as to balance off minor inequities in the representation of certain areas in the other house. In summary, these and other factors could be, and are presently in many States, utilized to engender differing complexions and collective attitudes in the two bodies of a state legislature, although both are apportioned substantially on a population basis."

■ In reapportioning and redistricting the senate, both houses overlooked the fact that, to be valid, the makeup of the senate must positively complement the makeup of the house, to provide the vital equality of voter representation. Both houses of the legislature seemingly forgot that the schemes of districting *each* house, when conjoined, must offer compensating advantages to the voters—not only to those voters within each representative district, be it senate or house, but to all voters throughout the State. While there perforce must be some overlap of representation with the several senate and house districts, that overlap must not be such as to concentrate and intensify the voting power of a single senatorial-representative district to the point that the voters therein have a built-in disproportionate representational advantage over any other voters of the State.

If the achievement of this goal is even to be approached, there should not be any monolithic political units of representation in that all-inclusive system of apportionment. Unless, within any single geographically defined political area or unit, there is a meaningful and substan-

tial difference in the composition of that body of electors therein, whose combined votes elect a senator, from that body whose combined votes elect a member of the house, then the demanded differing complexions and collective attitudes are lost, the necessary cross checking and resulting balance is absent, and the majorities therein are given a disproportional monolithic command, not only within the narrow political unit, but also within the legislative bodies. Such artificially concentrated political power negates any notion of equality of representation for the minorities entrapped therein, as well as for all other electors of the State outside such a monolithic political unit.

> "However complicated or sophisticated an apportionment scheme might be, it cannot, consistent with the Equal Protection Clause, result in a significant undervaluation of the weight of the votes of certain of a State's citizens merely because of where they happen to reside." WMCA, Inc. v. Lomenzo, 377 U.S. 633, 653, 84 S.Ct. 1418, 1428, 12 L.Ed.2d 568.

The Hawaiian legislature, whether innocently or designedly, has, nevertheless, built just such monoliths into its reapportionment scheme.

In its effort to achieve its objective of multi-member (three and four) senatorial districts in Honolulu, the legislature made the boundaries of the third senatorial district and the eighth representative district one and the same. Thus from *one* political and geographical unit would be elected four representatives and three senators—seven members of the legislature all responsible to and representing exactly the same constituency! Similarly, the sixth senatorial district was fashioned almost entirely from the fifteenth representative district, with the result that from the fifteenth representative unit, i. e., from the dominant three-fourths of the voting population of that senatorial district, would come six representatives and four senators. (31,302 of the senatorial district's total of 40,629 voters reside in the fifteenth representative district.)

While it is a fundamental factor under the decisions of The Court, population is not the sole definitive measure for setting up either representative or senatorial districts. Compactness and contiguity of the territory are admittedly also factors, but community of interests, community of problems, socio-economic status, political and racial factors—each and all must be considered, and not only must the electoral districts be laid out with the totality of those factors having been taken into consideration, but even more, the sum total of all of the districting must result in substantial equality of meaningful representation to each and all of the voters of the State. "(A)ll who participate in the election are to have an equal vote—whatever their race, whatever their sex, whatever their occupation, whatever their income and wherever their home may be in that geographical unit." Gray v. Sanders, 372 U.S. 368, 379, 83 S.Ct. 801, 808, 9 L.Ed. 2d 821. As indicated, not only was there no totality of consideration of the above factors in setting up the senatorial districts on Oahu, but there was even less totality of consideration of the factors of equal representation to all voters on Oahu and the rest of the State.

Here, the realistic political weight of the voters in both the third and sixth senatorial districts would far exceed the political weight of any voter in any other district, not only in Honolulu but in any other county of the State. It is patent to the court that both the house and the senate, in setting up the senatorial plan either failed or refused to recognize the effect that such a plan would have upon the basis for representation of the entire voting population. Both the Hawaiian senate and house ignored the admonition of the Supreme Court:

> "(I)n reviewing a state legislative apportionment case this Court must of necessity consider the challenged scheme *as a whole* in determining whether the particular State's apportionment plan, in its entirety,

meets federal constitutional requisites. It is simply impossible to decide upon the validity of the apportionment of one house of a bicameral legislature in the abstract, without also evaluating the actual scheme of representation employed with respect to the other house. Rather, the proper, and indeed indispensable, subject for judicial focus in a legislative apportionment controversy is the overall representation accorded to the State's voters, in both houses of a bicameral state legislature." Maryland Committee for Fair Representation v. Tawes, 377 U.S. 656, 673, 84 S.Ct. 1429, 1438, 1439, 12 L. Ed.2d 595. (Emphasis added.)

This court heretofore said that the house was not unconstitutionally apportioned. This court indicated the means by which the senate could be apportioned to give to every voter the equal protection and equal representation that he is entitled to without disturbing the makeup of the house, but because both houses failed to look at the political scene in its totality and instead viewed the reapportionment scheme of the senate as if it were something that could be fashioned without consideration of its tight juxtaposition to the house of representatives, each house of the legislature jointly and separately took such a myopic view of the political problem involved, that they failed to see and anticipate the overall result of arbitrarily joining their independently constructed senatorial plan with the existing representative scheme.[5] As indicated, both houses failed to heed the words of the Supreme Court, as well as any of the red lights this court had flashed. Both houses failed to heed the advice of the Attorney General of the State of Hawaii, and the end result, based as it is upon reasons which fall very, very short of justifying the resultant multi-member districting of both houses, fails to give to each and every voter of the State of Hawaii the fundamental equality of representation to which each is entitled under the Fourteenth Amendment.

Even if the above, alone, were not enough to render the proposed scheme invalid, it is manifest to this court that the legislature's adamant insistence on three and four-member senatorial districting was the conscious or unconscious—though not unnatural—reluctance of the affected senators to carve out single-member districts which thereafter would in all probability result in a political duel-to-the-death with a fellow and neighbor senator. To have cross-cut any of Honolulu's eighth, twelfth or fifteenth representative districts in order to mark out single-member senatorial districts would, with practical certainty, have left two or three present incumbents to compete head on for a single senatorial seat.

Likewise, the shift on Hawaii from the double, 2–1, senator district scheme, tentatively adopted on March 18th, to the single 3-senator district in the instant plan, was an unmistakable application to East Hawaii's incumbent senators of that same factor of political self-preservation implanted into the Honolulu districting scheme.[6]

---

5. As foretold in Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965) "[i]t might well be that, designedly or otherwise, a multi-member constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or political elements of the voting population."

6. "(I)n the absence of any reasonable justification (historical or otherwise), such districting (creation of single-member and multi-member districts) might be the result of gerrymandering for partisan advantage and, in that event, would be arbitrary and capricious. In the light of the constitutional pitfalls inherent in such a districting scheme, it would be more prudent to approach the matter of apportionment by setting up single-member districts unless valid and compelling reasons exist which require the creation of some multi-member districts." Butcher v. Bloom, 415 Pa. 438, 203 A.2d 556, 573.

This court finds that the present multi-member district scheme of senatorial reapportionment resulted, in a material part at least, from gerrymandering.

We find the proposed plan does not meet the test of equality of representation set down by our Supreme Court and is invalid. We therefore do not approve the plan.

Circuitous or expensive as it may be, the route set out by the Constitution of this State, viz., by way of a constitutional convention, must now be followed. Inasmuch as the plan set forth in H.B. 987 cannot be and is not approved by this court, it is therefore ordered:

(1) The stay order of this court dated April 19, 1965, is rescinded, effective forthwith; and

(2) As indicated in our Final Order of March 19, 1965, item 4 on pages 19–20, and item 6 on pages 20–21 of the Decision and Order of this court dated February 17, 1965, be and they are hereby automatically reinstated and now remain and shall continue in full force and effect until further order of this court.

▮ As may be noted, this court has not herein discussed H.B. 773. We are advised that it was able to pass the senate by but the barest majority, 13–12, far short of the two-thirds demanded by the State constitution for the adoption of a proposed constitutional amendment. The same also has not yet lain on the desk of the Governor for the ten days prior to final adoption, as provided by the constitution.[7] Therefore, procedurally, the same has not yet been submitted to us. Wright v. Rockefeller, 376 U.S. 52, 58, 84 S.Ct. 603, 11 L.Ed.2d 512. Even if it were, nevertheless, in view of our decision on the provisional plan, H.B. 987, we would not and now do not find it necessary to consider the validity of the proposed amendment, H.B. 773, or the question proposed by H.B. 986.

This court continues to retain jurisdiction of this action for all purposes.

This decision shall take effect forthwith.

---

7. In order to move the reapportionment problem with the greatest celerity, this court, nevertheless, had advised all parties that a provisional plan of reapportionment could be submitted to this court and a hearing had thereon immediately after the same was passed by the legislature and before the ten-day period during which a proposed amendment must lie on the desk of the Governor before the same can be adopted and passed. The instant hearing therefore was solely upon the matter of the proposed provisional plan.